**The below described is SIGNED.**

**Dated: March 6, 2014**





**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>**SCOTT COLBY DAWSON and SHANNA LYNN DAWSON,**<br><br>Debtors. | Bankruptcy Number: 10-21104<br><br>Chapter 7 |
| **NATHAN JONES,**<br><br>Plaintiff,<br><br>vs.<br><br>**SCOTT COLBY DAWSON and SHANNA LYNN DAWSON,**<br><br>Defendants. | Adversary Proceeding No. 12-02474<br><br>Judge William T. Thurman |

**MEMORANDUM DECISION**

If there was ever a need for a better drafted contract, this is the case. With just some attention to terms of performance, terms of default, deadlines and the like, much of the controversy that the parties have presented to the Court could have been resolved between them. However, those rudimentary terms are absent from the two page document that the parties agree is their written contract. Because of the sparsity of terms, the Court is forced to look to course of dealing between

the parties and industry norms to fill in the blanks. With this in mind, the Court has constructed this decision.

The matter before the Court is an adversary proceeding brought by Nathan Jones against Scott Colby Dawson and his wife, Shanna Lynn Dawson.[1] Mr. Jones requests that the Court deny Mr. Dawson's discharge of a particular debt, which Mr. Jones claims to be in the amount of $149,736.32, pursuant to 11 U.S.C. § 523(a)(2)(A).[2] Mr. Jones alleges that Mr. Dawson made fraudulent representations relating to the construction of an airplane hangar at the Provo City Municipal Airport (the "Hangar").

## I.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(b) and 157. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is appropriate under 28 U.S.C. § 1409. Notice for the trial is and has been appropriate in all respects.

## II.   Findings of Fact

1. Mr. Jones, through his agent, Mario Markides, solicited bids for the construction of the Hangar.

2. CoDa Construction, Inc. ("CoDa"), a Utah corporation solely owned by Mr. Dawson, was the successful bidder at a bid price of $270,700. Ms. Dawson was identified as the corporate

---

[1] At the conclusion of the two day trial on February 5, 2014, this Court found that Ms. Dawson did not make a fraudulent representation and concluded that her discharge on the alleged debt should not be denied pursuant to 11 U.S.C. § 523(a)(2)(A).

[2] In his initial complaint in his prayer for relief, which has not been amended, Mr. Jones requested that the debt be non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) and (a)(6), but included in the body of the complaint was a claim that the debt be non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Mr. Jones did not discuss the claim under 11 U.S.C. § 523(a)(4), and he announced in court that he is only proceeding under 11 U.S.C. § 523(a)(2)(A).

secretary; however, her involvement with CoDA was only to do some invoicing work under specific instruction from Mr. Dawson.

3.  Mr. Dawson received his contractor license from the state of Utah in April 2007, and is an experienced contractor.

4.  CoDa prepared an estimate for the total project. Exhibit 2, dated August 30, 2011, is the estimate prepared by Mr. Dawson and signed by Mr. Jones (the "Estimate").[3] Mr. Jones accepted the Estimate on or about September 9, 2011.

5. The Estimate includes the following components and specific costs for the construction of the Hangar:

- 80 x 75 x 20 prefab steel building with PBR walls reverse panel and gajvalume [sic] screw down roof with R-36 roof and R-19 walls with gutter and down spouts 1-framed opening 1-opening for bifold door 60x20 and 2-3070 doors – $65,000

- Erection on a 80x75 prefab steel building to be erected at the Provo Airport with PBR walls and galvalume roof with gutter and downspouts – $29,700

- Concrete on footings and foundation rebar, floor in building and drive way. Footings are to be standard 2 foot. Foundation to be standard 8" x 4' – $63,000

- Removal of Asphalt, Relocate drainage pipe (includes 1 extra drain), and dig foundation includes digging fiber optic and temp fencing – $39,500.

- Rough in Plumbing – $5,000

- 60 x 20 bifold door with auto lock and remote opener and sheeting – $30,500

- Exclusions - All prices are based on information provided to Coda Construction, Inc. and no sewer hookup just rough in and stubbed out

---

[3] Exh. 2.

3

        Insulation R-19 walls and r-36-roof – $10,800

- Plans and Permits – $17,000

- Electrical & Lighting as per invoice cost of material plus labor as per building codes – $0 (cost plus)

- Heating gas; line as per cost of materials plus labor – $0 (cost plus)

- Overhead door – $4,200

- 10 x 10 concrete room 8" thick walls 1-3060 steel door with lock set – $8,000

6. The Estimate as used by the parties sets out the scope of the project. However, as stated previously, many of the terms have to be imported from the course of dealing between the parties and the industry norms of the construction industry.

7. The Estimate shows a total fixed cost of $272,700, which number was reduced in writing to $270,700 on the Estimate.[4] The Estimate also contains terms anticipating some variable costs for electrical, lighting, heating gas line, and cost of labor for installation.[5] There is no written agreement as to the specific costs of these additional items.

8. Mr. Jones, who had previously hired contractors in six different hangar construction projects in Arizona, believed and was under the impression that Mr. Dawson would complete the project by December 25, 2011, but this completion date was not included in the Estimate.

9. Mr. Jones offered to pay the full $270,700 up-front at the start of the project, but Mr. Dawson refused his offer.

10. The parties agreed to follow industry custom, which was to invoice for each project

---

[4] *Id.*

[5] *Id.*

4

segment or component of the job for roughly 50% up-front with the balance to be invoiced and paid when that segment or component was completed. However, the parties did not follow industry norm at all times.

11. Further, as testified by Darrell Jason Lester, a worker on the job site, when a segment or component is first invoiced, industry custom is for the contractor to apply the funds received directly towards the items indicated in the invoice.

12. Each invoice issued by CoDa, prepared by Mr. Dawson or pursuant to Mr. Dawson's instruction, included a list of one or more items taken from the Estimate, provided the cost of the item, the description of the item, and included a total percentage of the job on each item. The total percentage indicates that the payment requested was for the commencement of the item listed, for an up-front payment that was required for the delivery of the item, or, if the component had been completed, that the remaining balance should be paid.

13. From September 2011 through February 2012, Mr. Jones paid CoDa $230,000 in multiple installments upon receipt of various invoices.[6]

14. Mr. Jones did not request receipts or proof of payments from Mr. Dawson for goods and services related to the project that Mr. Dawson was to pay, just invoices.

15. In preparing the Estimate, Mr. Dawson built in an internal profit of 20% of the cost of the project and an additional 10% on the specific costs of certain components on the Estimate, which he referred to as his "commission."

16. Mr. Dawson did not disclose his intended commission to Mr. Jones. According to Mr. Dawson's accounting on Exhibit 18 and Mr. Dawson's testimony, out of the funds received from Mr.

---

[6] *See* Exs. 3 and 18.

5

Jones, Mr. Dawson issued CoDa shareholder distributions in the minimum amount of $35,124.[7] Again, as stated above, Mr. Dawson was the sole shareholder of CoDa.

17. Mr. Dawson also accounted for a minimum distribution of $24,462.57 for "Builders Overhead."[8] At the time Mr. Dawson withdrew this builder's overhead amount from the funds paid by Mr. Jones for the construction of the Hangar, Mr. Dawson knew that he would not have sufficient funds remaining to complete the project.

18. At the commencement of the project, unexpected expenses arose. The Estimate was based on a footing to be "standard 2 foot," but because of the high ground water, Provo City required the foundation to be dug eighteen inches deeper than the standard two feet, thus requiring an extra 8,437.5 cubic feet of excavation and an increased quantity of gravel fill material. The parties agreed that Mr. Jones would pay for the increased cost, but never agreed upon the amount.

19. On October 7, 2011, Mr. Dawson issued an initial invoice, invoice number 130, for $70,000 that included the cost of the permits with a total percentage of 100%, indicating that Mr. Dawson would complete the appropriate papers and obtain the necessary building permits from Provo City for a total of $17,000.[9] The invoice also included a bifold door and the building indicating a total percentage of 65.57% and 50.77%, respectively.[10]

20. Mr. Jones paid for invoice number 130 in two installments,[11] the first installment of

---

[7] Ex. 18.

[8] *Id.*

[9] Ex. 5.

[10] *Id.*

[11] Ex. 16.

$55,000 and the second of $20,000, providing a credit of $5,000.[12] Mr. Dawson testified that he set aside $17,000 of the $55,000 payment for the permits. The Court received Exhibit 21 for impeachment purposes. Exhibit 21 shows that out of the initial $55,000 paid by Mr. Jones on September 9, 2011, Mr. Dawson made significant withdrawals for personal use through September 2011, contrary to his testimony as to the use of those funds. Accordingly, the Court does not find Mr. Dawson's testimony credible.

21. Mr. Dawson did not purchase the identified permit from Provo City for the construction of the Hangar, but instead began construction using a fast track permit from Provo City that limited construction to the foundation of the Hangar.

22. On October 7, 2011, Mr. Dawson issued a separate invoice for $25,000 for excavation indicating a total percentage of 63.24% completed, which Mr. Jones paid.[13]

23. Mr. Dawson issued an invoice on November 15, 2011 for concrete indicating a total percentage of 47.62% for a total amount of $30,000, which Mr. Jones paid.[14]

24. Mr. Dawson told Mr. Markides that 100% of the cost had to be provided before the building component for the Hangar could be delivered to the work site.[15] On December 1, 2011, Mr. Dawson issued an invoice with a total percentage of 100% for the building.[16] Because the building had not been delivered to the construction site, Mr. Jones paid $30,000 of $32,000 invoice, which

---

[12] Ex. 5.

[13] Ex. 4.

[14] Ex. 6.

[15] It is noted that the use of the word building is limited to the specific prefab steel building contemplated for erection on the site. While, the use of the word Hangar, contemplated a completed structure.

[16] Ex. 7.

7

funding was enough for the building to be delivered.

25. The building was delivered shortly after the invoice was issued, but Mr. Markides questioned Mr. Dawson about the height of the building. Mr. Dawson told Mr. Markides that the building was the correct height and only appeared shorter because it had not been erected. When the building was later erected, the building was a foot shorter than required.

26. On December 12, 2011, Mr. Dawson issued an invoice for excavation showing a total percentage of 100%,[17] but the excavation was not complete. Mr. Dawson told Mr. Markides that to complete the excavation he needed the remaining balance of the funds for the segment. Mr. Jones paid the balance, but Mr. Dawson never completed the segment.

27. On January 11, 2012, Mr. Dawson issued a second invoice for the concrete and bifold door indicating 100% completion for a total of $43,500.[18] Despite the statement of 100% total on the invoice, the concrete portion was not complete, and Mr. Jones withheld $13,500 of the payment. Mr. Jones paid 100% of the invoiced amount for the bifold door up-front as Mr. Dawson represented the payment was required for delivery.

28. On January 30, 2012, Mr. Dawson issued an invoice for erection of the building and insulation indicating a total of 50% and 100%, respectively, for a total of $25,650, which Mr. Jones paid.[19]

29. On February 27, 2012, Mr. Dawson issued an invoice for an overhead door and plumbing

---

[17] Ex. 8.

[18] Ex. 9.

[19] Ex. 10.

8

in the amount of $9,200 indicating a total percentage of 100%.[20] Mr. Dawson told Mr. Markides that Mr. Dawson needed the 100% payment up-front for delivery of the overhead door. Mr. Markides agreed, but believed that the request was ahead of schedule given the status of the project.

30. After issuing the second invoices on the bifold door and rebar, the items were delivered to the project site. However, the items were not taken off the delivery trucks and were returned to the manufacturers because the manufacturers, who Mr. Dawson had subcontracted with to make and deliver these items, never received the full payment from Mr. Dawson.

31. In mid-February, Mr. Dawson met with Mr. Markides. Mr. Markides told Mr. Dawson that no additional funds would be provided by Mr. Jones until the items already invoiced were completed as indicated by the total percentage, and that Mr. Dawson had three weeks to catch up with the segments and components invoiced.

32. Mr. Dawson did not meet the three week deadline.

33. On April 11, 2012, Mr. Markides received a call from an employee at the permit office of Provo City stating that the permit as indicated in the Estimate and invoices issued had not been paid for and that the project would be shut down if the permit was not purchased the same day.

34. Mr. Jones went to the Provo City office and purchased the permit on April 11, 2012. The full permit cost had previously been invoiced in invoice number 130, but, upon being paid for the same, Mr. Dawson did not purchase the permit. Further, Mr. Dawson has not reimbursed Mr. Jones for the permit he purchased on April 11, 2012.

35. At some point between the end of March and early April 2012, Mr. Dawson was "kicked off the project," which the parties understood meant that Mr. Dawson was no longer the contractor

---

[20] Ex. 12.

and that Mr. Jones would be completing the project with another contractor.

36. In April 2012, Mr. Dawson issued several more invoices to Mr. Jones.

37. Mr. Dawson contends that if Mr. Jones paid the remaining Estimate price, Mr. Dawson would have been able to complete the project.

38. Mr. Dawson and his wife kept an accounting of the invoices and funds paid relating to the project, and that accounting shows payments of invoices to suppliers related to the project in the amount of $90,310.67.[21]

39. The accounting kept by Mr. Dawson on Exhibit 18 also shows the following payments made out of the funds for the construction of the Hangar:

- Payroll and Taxes = $34,333.01
- Jason Lester = $2,700
- Insurance and bonding = $3,522.25
- Fuel = $3,449.92
- Shareholder Distributions = $35,124
- Auto and Truck Expenses = $11,607.44
- Office Rent = $3,000
- Professional Fees (accountant & legal) = $3,091.64
- Operating Expenses (equipment repairs, phones, etc.) = $3,848.52
- Travel Expenses to bid jobs = $759.23
- Miscellaneous building supplies = $5,093.12
- Advertising = $547.97
- Tools and equipment = $4,307.53
- Donations = $842.13
- Builders Overhead = $24,462.57

40. Mr. Dawson paid employees during the first few months of the project, but did not continue to pay the employees, including Mr. Lester, who claims he is still owed funds.

41. Mr. Dawson's accounting for fuel expenses of $3,449.92 and auto and truck expenses of $11,607.44 included both personal and business related activities, but it did not delineate a breakdown

---

[21] Ex. 18.

10

of what expenses went toward the Hangar.

42. Mr. Dawson believed that at the time he was kicked off the project, the project was about 90% complete, but Messrs. Jones and Markides believed the job was much farther from being completed when Mr. Dawson stopped work on the site.

43. Mr. Jones' total cost to complete the project, including the monies paid to Mr. Dawson, was $420,436.32, which is $149.736.32 over the Estimate.

## III. Discussion

### a. Legal Standard Under Section 523(a)(2)(A)

A party seeking non-dischargeability as to a particular debt has an uphill but not impossible battle. Exceptions to discharge are narrowly construed, and, according to the case law, any doubt is to be resolved in the debtor's favor.[22] Under 11 U.S.C. § 523(a)(2)(A),[23] a party asserting non-dischargeability must show by a preponderance of the evidence[24] that (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was justifiable; and (5) the debtor's representation caused the creditor to sustain a loss.[25] The Court addresses each of these elements in turn.

---

[22] *See DSC Nat'l Props., LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 168 (B.A.P. 10th Cir. 2012).

[23] Unless otherwise indicated, all future statutory references are to the Bankruptcy Code, Title 11 of the United States Code.

[24] *Grogan v. Garnder*, 498 U.S. 279, 291 (1991).

[25] *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *see also Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 and n.3 (10th Cir. 2009).

*i.     False Representations*

Mr. Jones asserts that the invoices produced by Mr. Dawson (both the initial invoices and the subsequent invoices) and the statements made to Mr. Markides are separate false representations under § 523(a)(2)(A). Mr. Dawson argues that an invoice is just an invoice, and is not any form of representation. The Court finds the testimony of Messrs. Markides and Lester credible, and the Court is persuaded that, based on industry custom as used and intended in this instance, an invoice is a representation that the funds to be received for the invoice will either be put towards the cost of the segment or component listed on the invoice or indicates that the remaining balance should be paid because the segment or component listed is completed.

Mr. Dawson prepared and presented numerous invoices to Mr. Jones; however, those invoices did not correctly reflect the progress of the Hangar. The course of dealing between the parties was a bit irregular, but they adopted a system as a general rule that required Mr. Dawson to issue two invoices for a particular component. The first invoice would generally be for some percentage of the total cost on the Estimate and the second invoice would be for the balance owed after completion. Many of the items on the invoices were neither completed nor paid for by Mr. Dawson. For example, Mr. Dawson invoiced for a permit to construct the Hangar in October 2011.[26] Mr. Jones paid the invoiced amount and believed that the permit was purchased, but later learned in April 2012 that Mr. Dawson never purchased the required permit. Mr. Dawson also issued invoices for the concrete and excavation segments, indicating that the segments were complete.[27] The segments were not complete. Despite representations that Mr. Dawson needed 100% of the funding up-front for the purchase of

---

[26] Ex. 5.

[27] Exs. 9 and 10.

a door and rebar, which amounts were paid up-front by Jones, Mr. Dawson did not pay the vendors for the items and the items were not delivered to or left at the job site by the provider. Mr. Dawson also issued first invoices for segments or components that were not ready for commencement at the job site. Through these invoices, Mr. Dawson made representations of the status of the project and what the funds from Mr. Jones would be used toward, which representations were false. Accordingly, the Plaintiff has met this burden of showing that the representations made by Mr. Dawson were false.

        ii.       *Intent*

The intent to deceive "may be inferred from the totality of the circumstances,"[28] and the debtor "must have acted with the subjective intent to deceive the creditor."[29] From Mr. Dawson's testimony, it is clear that he had experience in the construction industry prior to the Hangar project. Mr. Dawson argues that his intent was to complete the project, and relies on some of the work he completed on the project as a showing of his intent. Mr. Dawson claims that if he had received the rest of the funds as requested, he would have been able to finish the project. However, this argument is outweighed by the evidence presented by Mr. Jones. Mr. Dawson represented with each invoice that he would begin construction or had finished construction on a particular segment of the project. Familiar with industry custom, Mr. Dawson was aware that issuing those invoices represented that the funds would go to the construction of the Hangar, and the second invoice would indicate completion of that segment. Mr. Dawson did not put the payments received towards the items listed on the invoices as industry custom provides. He used funds received from Mr. Jones to issue shareholder distributions of a minimum of $35,124 and overhead of $24,462.57 instead of putting them toward the costs

---

[28] *In re Young*, 91 F.3d at 1375.

[29] *In re Johnson*, 477 B.R. at 169.

identified in the invoices, despite his knowledge that doing so would impair the construction of the Hangar. Accordingly, the Court finds that by a preponderance of the evidence Mr. Dawson had the intent to deceive Mr. Jones.

### iii. Reliance

Here, industry custom dictates that when an invoice is generated, the payment made on that invoice will go toward the component listed on the invoice. Mr. Jones received the invoices from Mr. Dawson and made payment on those invoices. As the project progressed, it became clear that some segments or components were not progressing as represented, but Mr. Jones provided payments relying on Mr. Dawson's statements that the balance was needed to complete the segment or obtain the component. Mr. Jones relied on the representations of Mr. Dawson.

### iv. Justifiable Reliance

Although the express language of the statute uses "reasonable" reliance, the United States Supreme Court stated in *Field v. Mans* that under § 523(a)(2)(A) a creditor must show justifiable reliance, a lower standard than reasonable reliance.[30] "Justifiable reliance does not require the creditor prove he acted consistent with ordinary care and prudence. Instead, '[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case.'"[31] Here, Mr. Dawson argues that Mr. Jones should have requested receipts or monitored the project more closely, therefore, his reliance is not justified. However, although these suggestions may be ordinary care and prudence, Mr. Jones, who had engaged in the construction of six other hangars

---

[30] 516 U.S. 59, 74–77 (1995).

[31] *Barney v. Perkins (In re Perkins)*, 298 B.R. 778, 792 (Bankr. D. Utah 2003) (citing *Field*, 516 U.S. at 74-75).

in the past, justifiably relied on the representations of Mr. Dawson. It is justifiable that he would rely on the invoices as representations of the status of the project under the circumstances and that the payments made to Mr. Dawson based on an invoice would be used for those items on the invoice.

   *v.*  *Loss*

Under § 523(a)(2)(A), the plaintiff must prove by a preponderance of the evidence that "the amount of his damages [is] attributable to *actual* fraud,"[32] and "'[b]ut for' causation alone is not enough."[33] Mr. Jones requests damages in the amount of $149,736.32, and claims that this amount is a direct and proximate result of Mr. Dawson's false representations. He calculates this amount by subtracting the bid amount on the Estimate or $270,700 from the total cost he paid to complete the project of $420,436.32 for a difference of $149,736.32. Mr. Jones has shown a loss under § 523(a)(2)(A), but has not persuaded the Court that $149,736.32 is the appropriate amount of damages. There were many items which Mr. Jones paid for which were not within the parameters of Exhibit 2, accordingly they should not be included in the loss calculation.

"Although nondischargeability under section 523 is a matter of federal law," as stated by our Bankruptcy Appellate Panel, which the Court finds persuasive, the Court "determine[s] 'the existence and the amount of the underlying debt' under state law."[34] Mr. Dawson correctly cited to *Long v. Stutesman* as the measure for damages for fraud under Utah law, which this Court also applies to a false representation. *Long* provides that the "measure of damages for fraud is [the] difference

---

[32] *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 692 (B.A.P. 10th Cir. 2013) (emphasis in original).

[33] *Phoenix Equity Ventures, LLC v. Baillio (In re Baillio)*, No. 08-1124, 2010 WL 3782065, at *21 (Bankr. D.N.M. Sept. 21, 2010).

[34] *Knaub v. Rollison (In re Rollison)*, No. CO-13-028, 500 B.R. 663, at *3 (B.A.P. 10th Cir. Oct. 29, 2013).

between [the] value of [the] property purchased and [the] value it would have had if [the] representations were true."[35] However, Mr. Dawson did not provide a figure as possible damages for the Court. In *In re Gerlach*,[36] the Tenth Circuit stated that if the creditor can prove that the debtor obtained credit through fraud, "the court should declare the debt nondischargeable in an amount which *it can reasonably estimate* as obtained by fraud."[37] Accordingly, the Court uses the standards of *Long* and *Gerlach* in reaching its own determination of damages.

The amount of damages here can be reasonably estimated under the guidance of *Long* and based on the evidence presented. Exhibit 18 is illustrative for the Court. Exhibit 18 is the accounting prepared by Mr. Dawson and his wife throughout the Hangar project using QuickBooks, a computer program. Although there can be questions about the accuracy of Exhibit 18, it is the only evidence presented to the Court that shows how Mr. Dawson used the amounts paid by Mr. Jones for the Hangar.

If all of the funds received by CoDa from Mr. Jones would have been placed into the construction of the Hangar, the value received by Mr. Jones would have been the amount of $230,000. The actual value of the property received by Mr. Jones was substantially less, but not without value. The Court finds that from the amounts in Exhibit 18, some were put toward the Hangar project and some were not. The Court finds that of the total received only $144,115.10 went toward the project.

---

[35] *Long v. Stutesman*, 269 P.3d 178, 184 (Utah Ct. App. 2011).

[36] *John Deere Co. v. Gerlach (In re Gerlach)*, 897 F.2d 1048 (10th Cir. 1990). *In re Gerlach* was decided before the Supreme Court issued *Grogan*, which, as cited above, determines that the burden on the creditor under § 523(a)(2)(A) is a preponderance of the evidence, not clear and convincing evidence. *In re Gerlach* used clear and convincing; however, the Court believes that the part of the opinion that does not address the burden of proof is still good law and should be followed here.

[37] *Id.* at 1052 (emphasis added).

This amount includes invoices paid by CoDa, payroll and taxes, amounts paid to Mr. Lester,[38] insurance and bonding, operating expenses, miscellaneous building supplies, and tools and equipment. For the purposes of this decision and computation, the Court has excluded the shareholder distributions, office rent, professional fees, travel expenses to bid jobs, advertising, donations, builder's overhead, and fuel and auto expenses that were indistinguishably used for both business and personal expenses from the $230,000 actually received. Thus, the value of the property received by Mr. Jones is calculated to be $144,115.10. This is best illustrated as follows:[39]

| **Description from Exhibit 18** | **Amount** | **Used Toward Hangar** |
|---|---|---|
| Invoices Paid | $90,310.67 | Y |
| Payroll and Taxes | $34,333.01 | Y |
| Jason Lester | $2,700.00 | Y |
| Insurance and Bonding | $3,522.25 | Y |
| Fuel | $3,449.92 | N |
| Shareholder Distributions | $35,124.00 | N |
| Auto and Truck Expenses | $11,607.44 | N |
| Office Rent | $3,000.00 | N |
| Professional Fees | $3,091.64 | N |
| Operating Expenses | $3,848.52 | Y |
| Travel Expenses to Bid Jobs | $759.23 | N |
| Miscellaneous Building Supplies | $5,093.12 | Y |
| Advertising | $547.97 | N |
| Tools and Equipment | $4,307.53 | Y |
| Donations | $842.13 | N |
| Builders Overhead | $24,462.57 | N |

---

[38] Although there was a dispute whether Mr. Lester was fully paid by Mr. Dawson, there was no dispute that Mr. Lester received payments at the start of the Hangar project. The accounting on Exhibit 18 shows payments for a commission, reimbursements, and a bonus, which the Court credits as funds put toward the project.

[39] Under the column "Used Toward Hangar," the Court finds that some amounts were properly used for the Hangar and some were not. A "Y" indicates that the amount has been contributed toward the Hangar project, and an "N" indicates that the amount was not.

17

Subtracting the value of the property received that the Court finds went into the construction of the Hangar (i.e. $144,115.10) from the total amount received from Mr. Jones, which would have been the value he expected and paid for if the representations were true (i.e. $230,000), the Court finds that the amount of loss suffered by Mr. Jones is $85,884.90 as a direct and proximate result of the false representations by Mr. Dawson. In other words, Mr. Dawson did not use $85,884.90 as he represented. Mr. Jones may have suffered other contractual damages, but the Court does not find or conclude that the alleged contractual damages arose as a result of the false representations made by Mr. Dawson.

### IV.    CONCLUSION

The debt owed by Mr. Dawson to Mr. Jones should be nondischargeable pursuant to § 523(a)(2)(A) in the amount of $85,884.90 and a judgment should be entered accordingly.

_____ooo0ooo_____
**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.

Jerome Romero
George W. Pratt
Jessica P. Wilde
JONES WALDO HOLBROOK & McDONOUGH, PC
170 South Main Street, Suite 1500
Salt Lake City, UT 84101
*Attorneys for Plaintiff*

George B. Hofmann
PARSONS KINGHORN & HARRIS
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
*Attorney for Debtors*